# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Theresa James,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 14-cv-02147 (APM)** |
| ) | |
| **District of Columbia,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff Theresa James, acting on behalf of her minor granddaughter, V.J., brought this action alleging that Defendant District of Columbia violated the Individuals with Disabilities Education Act (IDEA). At an administrative hearing, a Hearing Officer ruled that Defendant fulfilled its obligations under the Act. Plaintiff now challenges that ruling, asserting that Defendant: (1) failed to implement V.J.'s individualized education program until at least March 14, 2013; (2) failed to conduct a required comprehensive psychological evaluation of V.J.; and (3) failed to conduct a required speech-language evaluation of V.J. Defendant counters that its actions were appropriate under the IDEA and that Plaintiff failed to meet her burden of proof to show a violation.

Before the court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment. After considering the parties' submissions and the relevant law, the court concludes that Defendant violated the IDEA by failing to implement V.J.'s individualized education program and by failing to provide V.J. with a comprehensive psychological evaluation.

The court remands this matter to the Hearing Officer to fashion an appropriate remedy.  As for Plaintiff's contention that V.J. was denied a speech-language evaluation, because the record does not contain sufficient findings of fact to decide that question, the court will remand it to the Hearing Officer for further fact-finding.  Accordingly, the court grants Plaintiff's Motion in part and denies it in part; denies Defendant's Cross-Motion; and remands the case back to the Hearing Officer for further proceedings consistent with this Memorandum Opinion.

## II.   BACKGROUND

### A.   Factual Background

At all times relevant to this action, Plaintiff's granddaughter, V.J., was a student either in the District of Columbia Public School ("DCPS") system or in a charter school for which DCPS was the overseeing local government agency.  V.J. is intellectually disabled, making it difficult for her to learn with other students her age or participate in a normal classroom setting.  *See, e.g.*, Administrative Record, ECF No. 10 [hereinafter AR], at 53-54 (V.J. has "[s]ignificant deficits" in math and writing skills that "impact [her] ability to perform at grade level" and "interfere with her ability to participate in grade level class work.").  As far back as 2007, when V.J. was just nine years old, she received a Speech and Language Evaluation which determined that she had a "severe disorder in overall language skills" and "will experience difficulty in class with language comprehension and expression tasks."  AR at 12-13.  Three years later, V.J. underwent more tests which found that she "demonstrated very low visual motor integration skills that are equivalent to a child who is 6-years, 3-months old."  AR at 23-24.  Other evaluations found V.J. to be significantly behind her peers in development markers like verbal comprehension (3rd percentile); perceptual reasoning (1st percentile); working memory (4th percentile); and processing speed (0.1 percentile).  AR at 30-31.

*1.      The February 2012 and February 2013 IEPs*

V.J. attended the Richard Wright Public Charter School ("Richard Wright") for the 2011-2012 and 2012-2013 school years, when she was in the eighth and ninth grades, respectively.  Def.'s Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J., ECF. No. 12 [hereinafter Def.'s Mot.], at 4.  On February 22, 2012, DCPS convened a meeting to review V.J.'s individualized education program ("IEP") and to set her annual goals for the upcoming school year.  *Id.*; *see also* AR at 52.  The IEP that resulted from the meeting (the "February 2012 IEP") provided that, beginning on February 23, 2012, V.J. should receive 23 hours per week of "Specialized Education" from special education teachers outside of the general education classroom, 60 minutes per week of occupational therapy outside of the classroom, and 3 hours per week of reading instruction in a general education setting.  AR at 57-58.

The February 2012 IEP was in effect for almost a full year.  On February 5, 2013, while V.J. was still a student at Richard Wright, an IEP team met to review and revise the February 2012 IEP.  *Id.* at 69.  The resulting IEP (the "February 2013 IEP") found that V.J. had an "[i]ntellectual disability," functioned "at or near a 1st grade level" in math, could "read very basic words," and "ha[d] significant difficulty expressing herself effectively in independent writing."  *Id.* at 70-73. The February 2013 IEP required that V.J.'s specialized instruction be increased to 26.5 hours outside the general education setting per week.  *Id.* at 78.  In addition, V.J.'s IEP team determined that she required the assistance of a "dedicated aide" to help with her educational goals.  *Id.*

*2.      Plaintiff's Request for a Comprehensive Psychological Evaluation*

At the IEP meeting held on February 5, 2013, Plaintiff requested that the school conduct evaluations of V.J., including a comprehensive psychological evaluation.  *Id.* at 66.  V.J.'s school agreed to conduct the psychological evaluation, and in late February 2013, an employee of Richard

Wright emailed Plaintiff a "consent to evaluate form" and confirmed in the email that "we are all in agreement on a comprehensive psychological evaluation" of V.J. *Id*. at 98. Plaintiff's counsel confirmed a few days later that Plaintiff "agree[d] to a comprehensive psychological evaluation" but expressed concern that the consent form sent by Richard Wright did not specify which evaluations were to be administered. *Id*.

On March 5, 2013, Richard Wright apparently changed course and informed Plaintiff that no evaluations of V.J. would be conducted "outside of the triennial testing period" until a "Student Evaluation Planning meeting" could be held where data would be evaluated to confirm the need for testing. *Id*. at 100. Also on March 5, 2013, a DCPS employee conducted a classroom observation of V.J. at Richard Wright. *Id.* at 102. The resulting written report described V.J.'s troubles focusing in class and completing her school work, observed that the temporary dedicated aide assigned to her was not effective, and recommended that the aide be removed. *Id*. at 102-07. It also noted that the Richard Wright staff had said that "they are unable to fully implement this IEP" for V.J. *Id*. at 106-07.

Nine days later, on March 14, 2013, Richard Wright informed Plaintiff in writing of DCPS' recommendation that V.J. leave Richard Wright and enroll at "her neighborhood school . . . in the ID classroom" because her "IEP can be fully implemented there." *Id*. at 113. That notice stated that, because Richard Wright "is a full inclusion school, they are unable to fully implement [V.J.'s] current IEP." *Id*. Plaintiff's counsel objected to the recommendation to move V.J. from Richard Wright to another school and invoked "the parent's stay-put protections," keeping V.J. enrolled at Richard Wright through the end of the school year. *Id*. at 115.

3.      *Testing and Assessment of V.J. in 2013*

V.J. attended St. Coletta Public Charter School ("St. Coletta") for the 2013-2014 school year.  Pl.'s Mot. for Summ. J., ECF No. 11 [hereinafter Pl.'s Mot.], at 4.  On October 31, 2013, Plaintiff signed a consent form to have V.J. evaluated to determine whether she "[wa]s eligible or continue[d] to be eligible for special education and to determine educational needs."  AR at 172.  Although Plaintiff signed the consent in late October 2013, assessments and evaluations of V.J. occurred both before and after, including:  a Vocational Assessment Report on September 18, 2013, Def.'s Mot. at 6; AR at 129; a TEACCH Transition Assessment Profile ("TTAP") on October 2, 2013, AR at 133; a Psychological Triennial Reevaluation on October 23, 2013, *id.* at 145; and an Occupational Therapy Evaluation Report on December 11, 2013, *id.* at 175.

Of particular importance to this lawsuit is the Psychological Triennial Reevaluation.  *Id.* at 145.  The document is described in its header as a "Summary of Existing Data" and lists, among other things:  the sources of information reviewed; a description of V.J.'s educational profile; and the author's recommendations for V.J.'s future.  *Id.* at 145-47.  The Triennial Reevaluation stated that V.J.'s "last psychological assessment was completed in January of 2011" and reviewed the results of that assessment.  *Id.* at 146.  Notably, the Triennial Reevaluation did not reflect any new testing or evaluation of V.J.

The same day that the Psychological Triennial Reevaluation occurred, DCPS convened another meeting to review V.J.'s existing IEP and revise it if necessary.  *Id.* at 148.  Notes from the meeting taken by a representative of St. Coletta state that V.J.'s "[l]ast psychological evaluation was completed in 2010" and, despite certain scores "in the extremely low range [,] . . . [n]o updated evaluation is recommended at this time."  *Id.* at 142.  The IEP team did recommend, however, that the time spent by V.J. in specialized education outside of the general education classroom should

be increased to 29 hours per week, noting that the "[s]everity of disability and frequency/intensity of services require that student be removed from general education classroom to receive services as prescribed on the current IEP." *Id*. at 157.  For the first time, the IEP also determined that V.J. should be enrolled in a program aimed at allowing her to acquire a high school certificate—rather than a high school diploma—by the age of 21.  *Id*. at 167.

A final IEP meeting was held on January 14, 2014, at which the participants concluded that V.J. continued to meet the criteria of "a student with an Intellectual Disability as defined in IDEA" and should continue receiving "special education services at the current rate." *Id*. at 184.

### B.    Procedural History

On July 8, 2014, Plaintiff filed an administrative due process complaint with DCPS' Office of Dispute Resolution.  *Id*. at 207.  The complaint alleged that DCPS failed to (1) provide assessments of V.J. upon request of a parent or, in the alternative, (2) comprehensively reevaluate V.J. in all areas of suspected disability and/or upon parental request; and (3) implement V.J.'s IEP. *Id*.  Plaintiff requested relief in the form of (1) a declaration that DCPS denied V.J. a free and appropriate public education ("FAPE") due to its failure to provide assessments; (2) an order that DCPS fund the requested evaluations, convene an IEP meeting to review the evaluations, and then review and revise V.J.'s IEP, as well as pay reasonable attorney's fees; and (3) an order that V.J. receive appropriate compensatory education.  *Id*. at 210.  In its response to Plaintiff's administrative complaint, DCPS denied that it failed to provide V.J. with a FAPE, denied that it failed to implement V.J.'s IEP, and asserted that it completed all required assessments of V.J.  *Id*. at 225-26.

An administrative due process hearing occurred on August 19, 2014.  *Id*. at 318.  At the hearing, four witnesses testified:  Dr. Natasha Nelson, an expert in clinical psychology and

vocational assessments; Nancy Gregerson, the Center Director at Lindamood-Bell, a program that provides services to children and adults with learning disabilities; Plaintiff; and V.J. *Id.* at 4; Def.'s Mot. at 8-9.  Dr. Nelson explained that a comprehensive psychological evaluation entails, among other things, (1) interviews with the student, her parents and teachers, and (2) a battery of tests and evaluations designed to measure the subject's IQ, her achievements in reading, math, writing, and oral language skills, and her "social-emotional functioning" and "personality functioning." *Id.* at 371, 374-75 (testifying that a comprehensive psychological evaluation involves reviewing "the scores of the tests that are administered . . . [and] maybe some further testing.").  These tests are designed to measure how the student compares to a normal person her age.  *Id.* at 376.

Ms. Gregerson, who previously met with and evaluated V.J. on August 8, 2014, testified at the hearing that V.J. scored in the first percentile range or below in the tests that were administered during her evaluation.  *Id.* at 426.  She recommended that V.J. receive 200-240 hours of instruction at Lindamood-Bell "to get her where she needs to be." *Id.* at 426-27.

Plaintiff testified at the hearing that she first heard that Richard Wright was unable to provide the services to V.J. outlined in her February 2012 IEP at the meeting held almost a year later on February 5, 2013.  *Id.* at 450-51.  Finally, V.J. testified that she did not have a special education teacher while enrolled at Richard Wright.  *Id.* at 492.

On September 22, 2014, the Hearing Officer issued her opinion.  *Id.* at 3.  Despite finding that Richard Wright "was not able to implement [V.J.'s] 2012 IEP or 2013 IEP," the Hearing Officer denied Plaintiff all relief sought.  *Id.* at 3-9.  The Hearing Officer found that because Plaintiff "willingly" allowed her granddaughter to remain at the school "even though it could not implement the Student's IEP, DCPS could not be said to have denied Student a FAPE on this basis." *Id.* at 9.  The Hearing Officer also found that the length of time between Plaintiff's request

for evaluations in February 2013 and the initiation of certain assessments of V.J. in September 2013 did not constitute "unreasonable delay" and, even if it did, such a delay was merely a procedural—rather than a substantive—violation of the IDEA. *Id*. at 8.  With respect to Plaintiff's request for a speech-language evaluation, the Hearing Officer found that "[n]o evidence was offered" to show that V.J. required a follow-up to the evaluation conducted in 2007. *Id*. at 7.  The Hearing Officer did not rule specifically on whether V.J. was entitled to a comprehensive psychological evaluation. *Id*.

## III.   LEGAL STANDARD

### A.   Cross-Motions for Summary Judgment

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on an element of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*.

### B.      The IDEA

The Individuals with Disabilities Education Act ("IDEA") mandates that states, including the District of Columbia, which receive federal educational assistance must establish "policies and procedures to ensure," among other things, that a "free appropriate public education" is available to disabled children.  20 U.S.C. § 1412(a)(1)(A); *see also Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005).  The statute was enacted "to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  A FAPE requires that each child with a disability receive "special education and related services that" are "provided at public expense" and "in conformity with the [child's IEP]." *Id.* § 1401(9).

School districts may not ignore disabled students' needs, nor may they await parental demands before providing special education services; instead, they must proactively identify, locate, and evaluate children with disabilities who are in need of special education, and then develop an IEP for each such child.  *Reid*, 401 F.3d at 518-19.  As recognized by the Supreme Court, the IEP is the "primary vehicle" for implementing the goals of the IDEA.  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  An IEP is prepared at meetings between a representative of the local school district, the child's teacher, the child's parents or guardians, and when appropriate, the child.  *Id.*  The IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *Id.*; 20 U.S.C. § 1401(19).

The IDEA requires an initial evaluation to determine if a child is eligible for special education, and if so, what services the child's IEP should include. 20 U.S.C. § 1414 (a)(1). The evaluation must utilize "a variety of assessment tools and strategies." *Id*. § 1414(b)(2). After the initial evaluation, each child must be reevaluated if the local education agency determines it is necessary or if the child's parents or teacher requests a reevaluation. *Id*. § 1414 (a)(2)(A). The reevaluation shall take place "not more frequently than once a year, unless the parent and the local educational agency agree otherwise" and must be done "at least once every three years" unless the parent and local educational agency agree it is unnecessary. *Id*. § 1414(a)(2)(B). A reevaluation must employ the assessment tools and strategies required by § 1414(b)(2) and consider any existing data for the child. *Id*. § 1414(c)(1). If the IEP team determines that a reevaluation is not necessary because no additional data is needed to determine either the child's disability status or the child's educational needs, the local educational agency shall notify the child's parents of that determination and the reasons for it, as well as the parent's right to request a reevaluation anyway. *Id*. § 1414(c)(4)(A). The local educational agency must conduct a reevaluation if the child's parents request one. *Id.* § 1414(c)(4)(B).

The IDEA is violated when a school district deviates materially from a student's IEP. *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011) (citation omitted). A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by that child's IEP. *Holman v. District of Columbia*, No. 14-1836, 2016 WL 355066, at *2 (D.D.C. 2016) (citing *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007)). In other words, for the court to find a failure to implement an IEP, the school board or local authorities must have "failed to implement substantial or significant provisions of the IEP." *Wilson*, 770 F. Supp. 2d at 274 (citing

*Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)).  There is no requirement that the child suffer educational harm in order to find a violation; rather, the proportion of services mandated compared with those provided is "the crucial measure for purposes of determining whether there has been a material failure to implement" an IEP.  *Holman,* 2016 WL 355066 at *2 (citations omitted).

When a parent or guardian believes that a school district is denying a student a FAPE, the IDEA permits the individual to file a due process complaint and participate in an administrative hearing conducted by a hearing officer.  20 U.S.C. §§ 1415(b)-(c).  When such administrative review proves unsatisfactory, either the guardian or the local educational agency may file a civil action in any state or federal court.  *Honig*, 484 U.S. at 312.  Courts shall review the administrative record and, should either party request it, any additional evidence, and—using a preponderance of evidence standard—shall "grant such relief as the court determines is appropriate."  *Reid*, 401 F.3d at 521 (citation omitted).

The party challenging the hearing officer's ruling must "at least take on the burden of persuading the court that the hearing officer was wrong," and a court "upsetting the officer's decision must at least explain its basis for doing so."  *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989).  Accordingly, the court must give "due weight" to the hearing officer's decision and "may not substitute its own notions of sound educational policy for those of the school authorities."  *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 35-36 (D.D.C. 2013) (citations and internal quotations omitted).  With that said, the fact that a court may hear additional evidence at the request of a party and base its decision on the preponderance of the evidence "plainly suggest[s] less deference than is conventional" should be given to the hearing officer's determination.  *Kerkam*, 862 F.2d at 887.  And a decision "without reasoned and specific findings

deserves little deference." *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) (internal quotations omitted).

Where, as here, neither party has presented additional evidence, a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record. *S.S. ex rel. Shank v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 64 (D.D.C. 2008) (citation and internal quotation omitted). If the administrative record lacks "pertinent findings" and neither party enters additional evidence, the "court may determine that the appropriate relief is a remand to the hearing officer for further proceedings." *Reid*, 401 F.3d at 526 (internal quotations omitted).

A district court has "broad discretion to fashion an appropriate remedy" when a school district has failed to provide a student with a FAPE. *Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015). One such potential remedy is compensatory education. *Reid*, 401 F.3d at 522 (citations omitted). Compensatory education is an "equitable remedy" and must be based on "individualized assessments" of the child. *Id.* at 523-24. Any award of compensatory education must emanate from a "fact-specific" inquiry and must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id.* at 524.

## IV.   DISCUSSION

Plaintiff argues that her granddaughter was denied a FAPE in three distinct ways: (1) DCPS failed to implement V.J.'s IEP until at least March 14, 2013; (2) DCPS failed to conduct a required comprehensive psychological evaluation; and (3) DCPS failed to conduct a required speech-language evaluation. The court considers each of these claims in turn.

A.      **Whether DCPS Failed to Implement Plaintiff's IEP**

The first issue is whether DCPS failed to implement V.J.'s IEP during the 2012-2013 school year.  There are two relevant IEPs:  the February 2012 IEP, AR at 57, and the February 2013 IEP, AR at 78.  The court finds that DCPS did not comply with either one.

The February 2012 IEP states that V.J. had an "Intellectual Disability (also known as Mental Retardation)," and that V.J. had "[s]ignificant deficits" in math, reading, and written expression.  *Id*. at 52-54.  It called for V.J. to receive 23 hours per week of specialized instruction and one hour per week of occupational therapy outside of the general education classroom, along with three hours per week of reading inside the general education classroom.  *Id*. at 57.  The February 2013 IEP called for an increase in the number of hours of specialized instruction.  *Id*. at 78.

The Hearing Officer in this case found that Richard Wright "was not able to implement Student's 2012" IEP.  *Id*. at 6.  Nevertheless, the Hearing Officer found that DCPS did not violate the IDEA because Plaintiff—V.J.'s grandmother—"allowed [V.J.] to remain enrolled at [Richard Wright] throughout the 2012-2013 school year, despite the fact that [Richard Wright] was not able to implement" V.J.'s IEP.  *Id*. at 8-9.  That conclusion, of course, presupposes that Plaintiff actually knew that V.J. was not receiving services, but chose to do nothing about it.  Plaintiff challenges that critical evidentiary link, and points out that the Hearing Officer's finding was unsupported by any record evidence.  Pl.'s Mot. at 11.  The court agrees.  The Hearing Officer cited no evidence— and neither does Defendant in its briefing in this case—establishing that Plaintiff knew of Richard Wright's failure to carry out V.J.'s IEP between February 2012 and February 2013.

There is, however, record evidence to the contrary.  Plaintiff's unimpeached testimony was that she only learned about the lack of services being provided to V.J. at the February 2013 IEP Meeting:

> Q:  Okay, and I'm going to get that in a second Ms. James, but prior to that meeting that we had last February [2013] did anyone at Richard Wright ever tell you that they were not or could not provide [V.J.] with all those services on her IEP?
> A:  Of my knowledge, they said they couldn't.
> Q:  Okay, but did they –
> A:  (Inaudible), no.
> Q:  Right, and my question is did anyone tell you that before the meeting though?
> A:  No.

AR at 450-51.

The Hearing Officer correctly noted that Plaintiff invoked her "stay put" rights in March 2013 so that V.J. could remain at Richard Wright after DCPS suggested moving her to another school.  *Id*. at 6.  And the court agrees that once Plaintiff requested that her granddaughter stay at Richard Wright despite knowing that her IEP could not be implemented there, DCPS was relieved of any liability for a failure to implement it going forward.  But that does not absolve DCPS of responsibility for its failure to implement V.J.'s IEP from February 2012 until March 2013.

Defendant does not seek to defend the Hearing Officer's determination that Plaintiff, through her acquiescence, somehow forfeited her right to compel performance of the February 2012 IEP.  *See* Def.'s Mot. at 16-17.  Instead, Defendant argues that Plaintiff has not met her burden of proof to show that the February 2012 IEP was not implemented.  *Id*. at 17.  In particular, Defendant points out that no one testified at the administrative hearing as to the services V.J. did not receive.  *Id.*

Defendant's argument is odd because, in essence, it asks the court to reject the Hearing Officer's finding that Richard Wright "was not able to implement Student's 2012" IEP.  AR at 6.  And although it may be true that no one *testified* that Richard Wright failed to carry out V.J.'s IEP

14

from February 2012 through February 2013, the record contains ample *documentary* evidence to support that finding.  For example, in an email to Plaintiff's counsel in February 2013, a Richard Wright employee inquired whether V.J. was to be moved to another school given that "we can not fully implement [V.J.'s] current IEP."  *Id.* at 89.  An evaluation of V.J. by a DCPS employee on March 5, 2013, indicated that she is "being educated in inclusive classroom settings and her IEP is not being fully implemented" and that "Richard Wright PCS staff indicates they are unable to fully implement this IEP according to DCPS LEA compliance."  *Id.* at 104, 106.  Similarly, a document dated March 14, 2013, sent by Richard Wright to Plaintiff, informed Plaintiff that DCPS recommended moving V.J. to another school because "Richard Wright PCS is a full inclusion school, they are unable to fully implement the school's current IEP."  *Id.* at 113.  And V.J. testified at the administrative hearing that she did not have a special education teacher at Richard Wright. *Id.* at 492.

The foregoing establishes a "complete failure" by Richard Wright to implement both the February 2012 IEP and the February 2013 IEP up to and until March 14, 2013.  *See Wilson*, 770 F. Supp. 2d at 276 (the school's "complete failure" to provide the services provided for in an IEP constituted a material failure to implement the IEP).  In terms of this specific failure, this case is nearly on all fours with *Lofton v. District of Columbia*, 7 F. Supp. 3d 117 (D.D.C. 2013).  There, the student was supposed to receive 30 minutes of occupational therapy per week, but a school official testified that "the school is currently unable to provide occupational therapy."  *Id.* at 124. Finding that "the services mandated in [the student's] IEP *cannot* currently be provided at [his assigned school]," the court held that there had been a violation of the IDEA.[1]  Likewise here,

---

[1] To be precise, the court actually found a likelihood of success on the merits, as the case was presented on a motion for temporary restraining order and preliminary injunction.  *Id.*

Richard Wright officials and others repeatedly admitted that the school did not have the capacity to implement V.J.'s IEP.  A violation of the IDEA could not be any clearer.

### B.    Whether DCPS Failed to Conduct a Comprehensive Psychological Evaluation

The court next considers whether DCPS was obligated under the IDEA to conduct a comprehensive psychological evaluation of V.J. and failed to do so.  V.J. received an initial psychological evaluation in late 2010.  AR at 26.  That evaluation involved multiple interviews of V.J. and those close to her, as well as testing "conducted over several days and several months." *Id*. at 26-29.  V.J. was found to have an IQ of 58, a score which "meets the criterion of significant limitations in intellectual functioning needed for a classification of Mental Retardation."  *Id*. at 37.  The results of her testing in reading, writing, and math were described almost uniformly as "Extremely Low."  *Id*. at 38.

Plaintiff argues that, despite multiple requests since the 2010 evaluation, V.J. never received another comprehensive psychological evaluation.  Pl.'s Mot. at 12.  Specifically, Plaintiff contends that she requested an evaluation both at the IEP meeting held on February 5, 2013, and again at a meeting with DCPS officials held on March 12, 2013.  *Id.*  According to Plaintiff, these requests triggered an obligation under the IDEA for DCPS to conduct a comprehensive psychological evaluation—one which never occurred.  *Id.* (citing 20 U.S.C. § 1414(c)(4)(B)).

The Hearing Officer agreed that Plaintiff's demand for a comprehensive psychological evaluation triggered DCPS' obligation to provide one under the IDEA.  *See* AR at 8; Def.'s Mot. at 13.  She concluded, however, that DCPS' initial failure to provide such an evaluation did not violate the IDEA because, at most, Plaintiff had shown no more than a time delay in the testing.  AR at 8.  Pointing out that "DCPS began conducting assessments in September 2013," the Hearing Officer found that the seven-month delay between Plaintiff's demand for testing and its

16

implementation was reasonable under the circumstances and that, in any event, it was at most a procedural violation that did not rise to the level of a denial of a FAPE. *Id.* (citing *Smith v. District of Columbia*, 2010 WL 4861757, at *3 (D.D.C. Nov. 30, 2010), for the proposition that "[p]rocedural violations of IDEA do not, in themselves, inexorably lead a court to find a child was denied a FAPE").

Defendant concedes that DCPS had agreed to conduct a comprehensive psychological evaluation. Nevertheless, it defends the Hearing Officer's determination that DCPS' error, at most, was one of timing. Def.'s Mot. at 13-14. Defendant also argues—even though the Hearing Officer made no such finding—that DCPS met its obligation to provide a comprehensive psychological evaluation when it conducted a Psychological Triennial Reevaluation of V.J. on October 23, 2013. *Id*. at 13-14. And, finally, Defendant argues that even if the October 2013 reevaluation did not constitute a comprehensive psychological evaluation, it was merely a "procedural error" that did not violate V.J.'s substantive rights. Def.'s Reply to Pl.'s Opp'n to Def.'s Cross Mot. for Summ. J., ECF No. 16 [hereinafter Def.'s Reply], at 3.

The Hearing Officer's determination, and Defendant's effort to defend it, are misplaced. The IDEA distinguishes between an initial evaluation of a student and a "reevaluation." *See generally* 20 U.S.C. § 1414(a). An "initial evaluation," as the name implies, is an opening evaluation "to determine if the child is a child with a disability." *Id.* § 1414(a)(1)(B). A "reevaluation" refers to subsequent evaluations of a child deemed to have a disability. *Id.* § 1414(a)(2)(A). The IDEA provides that a reevaluation shall be conducted if a local education agency determines that one is warranted, a teacher requests one, or—as occurred here—if the child's parent or guardian requests one. *Id.* § 1414(a)(2)(A)(i), (ii).

The IDEA also sets out detailed requirements for a reevaluation. *Id.* § 1414(b), (c). As pertinent here, a reevaluation requires the local education agency to review not only existing information about the child, *id.* § 1414(c), but also to conduct additional testing to determine the child's abilities and needs, *see id.* § 1414(a)(2)(A)(ii) (providing that, if the child's parents or teacher requests an evaluation, it must be conducted in accordance with § 1414(b), which directs the local education agency to use "a variety of assessment tools and strategies" and "not use any single measure or assessment as the sole criterion for determining whether a child" has a disability). Among other testing requirements, the local education agency must "use technically sound instruments that may assess the relative contribution of cognitive and behavior factors, in addition to physical or developmental factors." *Id.* § 1414(b)(2)(C). In other words, a reevaluation requires a new round of tests and analysis to evaluate the child.

The Psychological Triennial Reevaluation of V.J. administered in October 2013 fell well short of the IDEA's reevaluation requirements and did not, as Defendant contends, rise to the level of a "comprehensive psychological evaluation." AR at 145. A subheading that appears on the Reevaluation itself confirms that it is merely a "Summary of Existing Data." *Id.* The Reevaluation notes that V.J.'s "last psychological assessment was completed in January of 2011," describes those results, and recommends that she continue to receive special education services. *Id.* at 146-47. Most importantly, the Psychological Triennial Reevaluation did not involve any new testing or assessment of V.J.

Further, Plaintiff's psychology expert, Dr. Natasha Nelson, testified at the administrative hearing that a comprehensive psychological evaluation includes testing that evaluates, among other things, the child's IQ; achievements in reading, math, writing, oral language skills; and, social-emotional and personality functioning. AR at 371, 374-75. She testified that for children—

like V.J.—with intellectual disabilities, it would be "routine" to order an "adaptive evaluation," which would include an "adaptive behavior assessment system," such as "a Vineland or an ABAS-II." AR at 375. It is apparent from the face of the Psychological Triennial Reevaluation that none of this was done for V.J. in October 2013. Ultimately, DCPS even conceded at the administrative hearing that, despite admitting that it had to do a comprehensive psychological evaluation, it had not yet conducted one. AR at 522 (stating in closing: "DCPS offered to do [a comprehensive psychological evaluation]. DCPS has not had an opportunity to complete a comprehensive psychological assessment for the student."). Because it involved no new testing or analysis, the October 2013 Reevaluation did not constitute a comprehensive psychological evaluation

Defendant's contention that its failure to provide a comprehensive psychological evaluation was only a procedural error and not a denial of a FAPE is, to say the least, confounding. The role of an evaluation "is to contribute to the development of a sound IEP." *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 67 (D.D.C. 2008). "[C]ontinual evaluations [a]re necessary, and parents must have the ability to seek redress for a school's failure to sufficiently monitor a child's progress under the IEP . . . ." *Id.* at 68 (*citing Honig*, 484 U.S. at 311-12). The court in *Harris* found that a failure to act on a request for an evaluation of a child "is certainly not a mere procedural inadequacy; indeed, such inaction jeopardizes the whole of Congress' objectives in enacting the IDEA." *Id.* at 69. The same is true here. The failure to conduct a new comprehensive psychological evaluation of V.J. means that her IEP might not be sufficiently tailored to her special and evolving needs. This potentially compromises the effectiveness of the IDEA's protections as they pertain to V.J. Accordingly, Defendant DCPS is ordered to provide and fund a full comprehensive psychological evaluation of V.J.

**C.**      **Whether DCPS Failed to Conduct a Speech-Language Evaluation**

Finally, the court considers whether DCPS failed to provide V.J. with a speech-language evaluation.  V.J. last received a speech-language evaluation in 2007.  AR at 12.  Although she recognized that V.J.'s last evaluation had occurred seven years earlier, the Hearing Officer determined that "[n]o evidence was offered . . . from which the hearing officer can conclude that Student requires an additional speech-language assessment."  *Id*. at 6.

Plaintiff argues that V.J. is entitled to a speech-language evaluation because her disability extends to the areas of speech and language.  Pl.'s Mot. at 15.  Plaintiff points to the findings of her 2007 evaluation, which concluded that V.J. had a "severe receptive and expressive language disorder" with "severe weaknesses in receptive vocabulary and moderate weaknesses in expressive vocabulary."  *Id*.; AR at 15.  Furthermore, Plaintiff contends that because she asked DCPS to perform a speech-language evaluation, DCPS was obligated to perform one.  Pl.'s Mot. at 15.  Defendant disagrees, and argues that Plaintiff never requested a speech-language evaluation during the relevant time period, and instead only asked for one in the administrative due process complaint more than a year later.  Def.'s Mot. at 13, n.2.  Defendant also contends that there has not "been a showing that speech/language is an area of suspected disability."  Def.'s Reply at 3.

Based on this record, it is unclear to the court whether V.J. has a disability in the area of speech and language.  The Hearing Officer referenced the 2007 speech-language evaluation, but her ruling made no reference to its findings.  And, while the findings from the 2007 evaluation quoted above would seem to support a speech-language disability, the court is ill-equipped, based on the scant record, to draw a firm conclusion.

If Plaintiff does have a speech-language disability, it would appear that she was entitled to a reevaluation by DCPS as early as 2010.  *See* 20 U.S.C. § 1414(a)(2)(B) (mandating that a

reevaluation take place "not more frequently than once a year, unless the parent and the local educational agency agree otherwise" and must be done "at least once every three years" unless the parent and local educational agency agree it is unnecessary).  Because the IDEA mandates a reevaluation every three years, Defendant's argument that Plaintiff is not entitled to a speech-language evaluation because she didn't ask for one appears to be foreclosed.  Ultimately, however, there are not enough factual findings for the court to determine if V.J. has a speech and language disability.  Accordingly, the court will remand this issue to the Hearing Officer for further fact-finding to determine whether, in fact, V.J. does have such a disability.  If she does, the court thinks it obvious that she would be entitled to a speech-language evaluation now almost 10 years after her last one.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgement is granted in part and denied in part, and Defendant's Cross-Motion for Summary Judgment is denied.

This case is remanded to the Hearing Officer for further proceedings consistent with this Memorandum Opinion.  The Hearing Officer shall hold a hearing within 30 days (1) to determine an appropriate remedy, including the proper amount of compensatory education, for Defendant's failure to implement V.J.'s IEP during the 2012-2013 school year; (2) to require DCPS to perform a comprehensive psychological evaluation of V.J.; and (3) to determine whether V.J. has a disability in the area of speech and language and, if so, whether DCPS failed to provide a timely speech-language evaluation as required by the IDEA, and to determine an appropriate remedy, if any, for that failure.  This court shall retain jurisdiction over this matter to adjudicate any dispute that might arise with respect to an award of attorney's fees.  The parties shall submit a status report

to the court no later than August 22, 2016, advising whether any further litigation will be required in this court.

A separate Order accompanies this Memorandum Opinion.

Dated:  June 21, 2016

Amit P. Mehta
United States District Judge